UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

BERNARD E. BAILEY,          )
                            )
    Plaintiff,              )
                            )
vs.                         )    Case No. 4:99CV1325SNL
                            )
DORA SCHRIRO,               )
                            )
    Defendant.              )

## ORDER

In accordance with the memorandum filed herein this date,

**IT IS HEREBY ORDERED** that defendant's motion for summary judgment (#62) be and is **GRANTED**. Judgment is hereby entered for defendant and against plaintiff on the merits of plaintiff's sole claim of retaliation against the defendant. Each party shall bear their respective costs. No further action shall be taken in this case.

**IT IS FURTHER ORDERED** that defendant's motion for leave to supplement the summary judgment record (#63) be and is **GRANTED**.

**IT IS FINALLY ORDERED** that plaintiff's letter, dated June 21, 2001, and received by the undersigned in his chambers, be docketed as part of the court record in this case.

Dated this 25th day of October, 2001.

SENIOR UNITED STATES DISTRICT JUDGE

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

BERNARD E. BAILEY, )
 )
Plaintiff, )
 )
vs. ) Case No. 4:99CV1325SNL
 )
DORA SCHRIRO, )
 )
Defendant. )

## MEMORANDUM

This matter is before the Court on the defendant's motion for summary judgment (#62), filed June 18, 2001. Responsive pleadings have been filed.[1]

Courts have repeatedly recognized that summary judgment is a harsh remedy that should be granted only when the moving party has established his right to judgment with such clarity as not to give rise to controversy. New England Mut. Life Ins. Co. v. Null, 554 F.2d 896, 901 (8th Cir. 1977). Summary judgment motions, however, "can be a tool of great utility in removing factually insubstantial cases from crowded dockets, freeing courts' trial time for those that really

---

[1] On June 21, 2001 this Court received a letter from plaintiff informing the Court that the complaint plaintiff had originally filed did not raise the allegations that he sought to bring before the Court. Evidently, plaintiff blames a fellow inmate (Melvin Leroy Tyler) for filing a complaint which did not contain the claims that plaintiff wanted addressed by the Court. In fact, plaintiff asserts that he has no complaint against defendant Schriro with regard to the allegations in the present complaint. He states that he wants to dismiss this complaint and file a new one. The Court awaited the filing of a motion to this effect but plaintiff failed to file one. In fact, on July 25, 2001 plaintiff filed a motion requesting additional time to respond to the instant motion. On August 17, 2001 plaintiff filed a response to the instant motion. The Court assumes that plaintiff changed his mind and decided to challenge the merits of the summary judgment motion. Thus, the Court will file the letter of June 21, 2001 as a matter of record only. No consideration was given to the letter with regard to the Court's disposition of this matter.

do raise genuine issues of material fact." Mt. Pleasant v. Associated Elec. Coop. Inc., 838 F.2d 268, 273 (8th Cir. 1988).

Pursuant to Fed.R.Civ.P. 56(c), a district court may grant a motion for summary judgment if all of the information before the court demonstrates that "there is no genuine issue as to material fact and the moving party is entitled to judgment as a matter of law." Poller v. Columbia Broadcasting System, Inc., 368 U.S. 464, 467, 82 S. Ct. 486, 7 L.Ed.2d 458 (1962). The burden is on the moving party. Mt. Pleasant, 838 F.2d at 273. After the moving party discharges this burden, the nonmoving party must do more than show that there is some doubt as to the facts. Matsushita Elec. Industrial Co. v. Zenith Radio Corp., 475 U.S. 574, 586, 106 S. Ct. 1348, 89 L.Ed.2d 538 (1986). Instead, the nonmoving party bears the burden of setting forth specific facts showing that there is sufficient evidence in its favor to allow a jury to return a verdict for it. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249, 106 S. Ct. 2505, 91 L.Ed.2d 202 (1986); Celotex Corp. v. Catrett, 477 U.S. 317, 324, 106 S. Ct. 2548, 91 L.Ed.2d 265 (1986).

In passing on a motion for summary judgment, the court must review the facts in a light most favorable to the party opposing the motion and give that party the benefit of any inferences that logically can be drawn from those facts. Buller v. Buechler, 706 F.2d 844, 846 (8th Cir. 1983). The court is required to resolve all conflicts of evidence in favor of the nonmoving party. Robert Johnson Grain Co. v. Chem. Interchange Co., 541 F.2d 207, 210 (8th Cir. 1976). The Court will now consider the facts in this case.[2]

---

[2]As a brief reminder, this cause of action is before the Court on remand. On October 18, 2000 the Eighth Circuit affirmed this Court's dismissal of all claims except for plaintiff's claim of retaliation against defendant Schriro; plaintiff's claim was remanded to this Court for further proceedings. See, Tyler, et. al. v. Carnahan, et. al., 230 F.3d. 1066 (8th Cir. 2000).

The material facts in this case are largely undisputed. Plaintiff has been incarcerated within the Missouri Department of Corrections since 1981. During this time, he has been convicted of several crimes due to felonious conduct (several involving violent behavior) in Missouri's prisons. In 1998, plaintiff was incarcerated at Potosi Correctional Center (PCC). Defendant Schriro was Director of the Missouri Department of Corrections (MDOC) in 1998-99, the relevant time-period.[3]

In early 1998, plaintiff was part of the general prison population and housed in Units 2 and 6 at PCC. On February 4, 1998 plaintiff was involved in a fight with another inmate. Upon a finding that plaintiff was a security risk due to his violent nature and a need to separate him from the general prison population, plaintiff was placed in Temporary Administrative Segregation Confinement (TASC). This placement was continued until February 26, 1998. Defendant's Exhibit H.

On February 26, 1998 a classification hearing was held. Upon review of plaintiff's prison record, the Classification Committee decided to discontinue plaintiff's general prison population status and reassign him to the Special Needs Unit (SNU), Level 4. Defendant's Exhibit S. The SNU is a specialized section of PCC which houses those inmates found to be in need behavior modification treatment. It is a mental health unit run in cooperation with the Missouri Department of Mental Health (MDMH). The SNU is operated on a daily basis independent of the prison facility's daily operations, and is not under the control or supervision of prison administrative staff, including the Director of the MDOC.  Once an inmate is identified by PCC staff as being in need of such treatment, he is evaluated by MDMH staff, and if found eligible, is housed in the SNU housing units and receives treatment. Typically, inmates assigned to SNU

---

[3]Defendant Schriro was replaced in May 2001 as Director of MDOC.

-3-

have had a history of serious difficulties in functioning in the general prison population and/or administrative segregation. Assignment to SNU is not a choice by the inmate. Offenders upon arrival at the SNU are usually assigned to Level 4 (if coming from the general prison population)[4]. There are five (5) levels of assignment in the SNU; each level has its own restrictions. As an inmate progresses from Level 4 or 5 up to Level 1, restrictions decrease and privileges increase. Defendant's Exhibits C and D; Affidavits of Sharon Gifford and John T. Johnson, respectively.

At Level 4, an inmate is restricted to his cell and if permitted outside, he must wear wrist restraints. Some personal property is allowed to be retained. A Level 4 inmate is permitted to shower three (3) times a week; canteen once a month; reading and writing privileges; and recreation three (3) times a week in an outer yard. Offenders in Level 4 receive individual counseling and MDMH staff may require them to do treatment-related activities in their cells. As an inmate progresses upward from Level 4, he is increasingly allowed more personal property. Canteen privileges improve as an inmate progresses through Levels 3, 2, and 1. Out-of-cell time, without wrist restraints, increases as an offender progresses through Levels 3, 2, and 1. Time in PCC's gym is provided to Level 1 inmates. Once an inmate reaches Levels 3, 2, 1 or Honors, he is offered certain programs/services: "Rational Behavior", "Anger Control", "Pre-Missouri Sexual Offenders Program", "Breaking Barriers"; as well as GED tutoring and individual counseling. Defendant's Exhibit D.

When an inmate assigned to the SNU engages in misconduct, the SNU staff generate Reports of Behavior (RIBs). A committee consisting of SNU and DOC staff members will

---

[4]Offenders coming from administrative segregation are usually assigned to Level 5 - the most restrictive level.

review the RIB and decide how to address the misconduct. Reprimands may consist of revocation of privileges, increased or modified restrictions, and/or a change of level status (i.e. from a Level 2 to a Level 3). Defendant's Exhibit D.

Beginning with the date of his assignment to SNU (February 26, 1998) and continuing throughout his SNU assignment, plaintiff wrote letters to defendant Schriro and others complaining of his reassignment and threatening acts of violence if he wasn't placed back into the general prison population. Defendant's Exhibits J, K, L, M, N. O, P, Q and R. The letters are highlighted as follows:

> 1) February 26, 1998: plaintiff wrote to George Lombardi (Director of MDOC's Division of Adult Institutions) complaining of his reassignment to SNU and stating, *inter alia*, "I refuse to abide by the mental health unit". He also threatened to go on a hunger strike and file a lawsuit.
>
> 2) March 17, 1998: plaintiff wrote to Lisa Jones (MDOC's Constituent Services Office) stating, *inter alia*, "I don't want to revert to my old ways of violence . . . but I can't take this much longer." Plaintiff also complains that due to his refusal to participate in treatment, he is being threatened with the use of "nut drugs".
>
> 3) March 23, 1998: plaintiff again wrote Jones stating, *inter alia*, "I am gotten to the point where I feel that I am pushed into a corner; and or forced into other forms o[f] action . . . I am starting to feel that violence is all you people truely **[sic]** understand." He complains that he is tired of "playing games" and doesn't understand why [Ms. Jones]} won't help him get out of the SNU the "peaceful way".
>
> 4) March 29, 1998: plaintiff wrote defendant Schriro stating, *inter alia*, "Is violence all you people understand? . . . I will hurt these pigs, caseworkers or whatever! I don't care anymore . . . get me out this unit or we will have violence . . . to hell with my parole, to hell with ever getten **[sic]** out!!" Plaintiff threatens that if he isn't out of SNU in two weeks, he will not only hurt someone but also file a lawsuit.
>
> 5) March 31, 1998: plaintiff wrote Jones again stating, *inter alia*, "You people are always wondering why violence happens in here

. . . Just remember that what comes around goes around, what goes up must come down . . . life is what we force out of it." (This letter contains numerous instances of profanity) Again, plaintiff threatens to file a lawsuit.

6) July 12, 1999: plaintiff wrote Jay Cassady (MDOC Constituent Services Office) stating, *inter alia*, "Get me out before someone truely [sic] gets hurt."

7) August 17, 1999: plaintiff wrote a letter to State Representative Quincy Troupe stating, *inter alia*, "I've done some things ago I ain't proud of by these people have really push[ed] me to the point of reacting like a `mindless animal' as it seems `violence' is all they understand or respond to." Plaintiff continues to complain about his restrictions and that he believes his assignment to SNU is nothing more than a ruse to sabotage his parole date.

8) August 18, 1999: plaintiff again wrote to defendant Schriro stating, *inter alia*, "I have about had it! Do you fully understand me? Do you want distaster [sic] to erupt? Blow-up! . . . I am not a person to do this much! I am more prone to violence. Is that what you want?.. . Sooner or later if it continues I'll end up reverting back to my old self and reacting with violence." He continues to complain about his restrictions and demands a transfer to Pacific Correctional Center and return to the general prison population.

9) August 30, 1999: plaintiff again wrote to Rep. Troupe stating, *inter alia*, "Keeping me locked in a cell is only making me more bitter and giving me more hate within do [sic] to the mistreatment to continue to treat a prisoner as an animal only brings out more hate and violence." Plaintiff continues to complain about his restrictions.

As to the letters written to defendant Schriro, these letters were processed according to standard MDOC protocol in place at the time. In 1998-99, when an inmate wrote directly to defendant Schriro in Jefferson City, administrative assistants (Carol Bolin and/or Elaine Ready) routinely routed such letters, unopened, to the MDOC's Constituent Services Office for the appropriate responsive action. Defendant's Exhibit E - Affidavit of Elaine Ready. The Constituent Services Office either answered the letter itself or requested that a MDOC zone director or correctional center staff member answer it directly. Defendant Schriro did not personally review any of the

letters sent to her by the plaintiff in 1998-99. Defendant's Exhibits B - Affidavit of Dora Schriro and Exhibit E.

Other that writing letters, plaintiff engaged in several acts of disruptive behavior while in the SNU. On May 28, 1998, razor blades were found in a vent in his cell. A RIB was written up and reviewed by a committee consisting of Chris Brewer (MDMH), John Johnson (MDMH), E. Burch (MDOC), Dorothy Been (MDMH), and Rick Minard (MDOC). The decision was made to change plaintiff's status level from Level 1 to Level 4 for thirty (30) days. Defendant's Exhibits D and T. On June 19, 1998 plaintiff damaged the interior fire safety sprinkler nozzle in his cell.[5] Defendant's Exhibit I. On December 28, 1998, towels that did not belong to plaintiff were discovered in his cell. An RIB was written up and reviewed by a committee consisting of C.O.I Randy Woods (MDOC), Jim Miller (MDMH), Johnson, and Minard. The decision was made to keep plaintiff at his Level 3 status but place an additional restriction on him; i.e. he would be permitted out of his cell only when a qualified mental retardation professional and a correctional officer were present. This restriction would last ninety (90) days. Defendant's Exhibits D and U. On July 8, 1999, plaintiff was given an RIB for dumping a jar of coffee into another inmate's cup, spilling coffee all over the floor, and failing to clean up the mess. The RIB was reviewed by a committee consisting of Brewer, Johnson, Been, and Miller. The decision was made to change plaintiff's level status from a Level 1 to a Level 2 with cell restrictions for three (3) days. Defendant's Exhibits D and V.

---

[5]Although the evidentiary record indicates that a RIB was written up, there is no indication of what action was taken in response to plaintiff's misconduct.

This lawsuit commenced on August 26, 1999. On September 8, 1999 plaintiff finished eighteen (18) months of continuous assignment to the SNU and was released into the general prison population at Potosi.

It is unclear as to the exact nature of the plaintiff's claims. He appears to be contending that he was "wrongfully" placed in the SNU unit by defendant, and that despite his allegations of mistreatment, defendant failed to remove him from the SNU unit. He also appears to claim that because of his complaints he was subjected to "harassment" by SNU staff. The appellate court characterized his claims as ones for retaliation.[6] Upon review of the parties' pleadings, the evidentiary record before this Court, and the relevant caselaw, plaintiff's claims of retaliation must fail. He has failed to demonstrate any disputed issue of material fact regarding defendant's non-involvement in any fashion with his assignment to SNU or his treatment while in SNU. There is nothing before this Court which would demonstrate to any reasonable juror that defendant engaged in acts in retaliation for the exercise of any constitutionally protected right or activity.

The evidence before this Court clearly shows that plaintiff's §1983 claim for retaliatory transfer or discipline is meritless. While an inmate does not have a constitutional right to pick and choose his prison, or even wards/units within a prison facility; a prisoner cannot be

---

[6]This Court respectfully disagrees with the appellate's court's finding for the simple reason that a basic requirement of a retaliation claim is that acts were perpetrated against a plaintiff in retaliation for the plaintiff's exercise of a constitutionally protected right or activity. In fact, the cases cited by the appellate court all involved acts taken by defendants against plaintiffs who were exercising their constitutional rights; i.e. filing a lawsuit, using the prison grievance system, facing a threat to basic health and safety conditions in prison. In the instant case, plaintiff has failed to articulate any constitutional right he was exercising at the time he was placed in SNU. It appears that the "retaliation" that plaintiff originally complained of was in connection with the conditions of confinement after he was placed in the SNU; however, his pleadings in response to the summary judgment motion appear to be primarily focused upon defendant allegedly putting him in the SNU in the first place.

transferred for exercising his constitutional rights. Goff v. Burton, 7 F.3d. 734, 738 (8th Cir. 1993). In order to prevail on a §1983 retaliatory transfer claim, a plaintiff must prove that a desire to retaliate was the actual motivating factor behind the transfer; i.e. that "but for" the exercise of a constitutionally protected activity or right, plaintiff would not have been transferred. Goff v. Burton, 91 F.3d. 1188, 1191 (8th Cir. 1996). In the instant case, plaintiff has failed to set forth any affirmative evidence that even gives rise to an inference of retaliation, let alone a motivating desire on the part of defendant to retaliate. Defendant had no input into the decision to assign plaintiff to the SNU. She has no supervisory authority regarding the assignment of inmates to SNU. The undisputed evidence before the Court indicates that MDOC staff at Potosi reviewed plaintiff's prison record, including his latest infraction for fighting, assigned him to TASC and recommended evaluation for placement in the SNU. The undisputed evidence further shows that MDMH staff alone evaluated plaintiff for placement and accepted him for assignment to the SNU. Finally, the undisputed evidence shows that MDOC staff at Potosi then made the final decision to reassign plaintiff to the SNU. There is no evidence before the Court showing that defendant had any personal involvement (much less a motivating retaliatory desire) in evaluating plaintiff for placement in the SNU or in the final decision to reassign him to the SNU.[7] *See,* Rustan, Jr. v. Rasmussen, 208 F.3d. 218 (8th Cir. 2000)(unpublished decision)(since plaintiff fails to rebut defendants' evidence that they had no part in the transfer decision,

---

[7]Plaintiff asserts that he was improperly placed in the SNU for fighting and that placement in the SNU "is only a voluntary assignment housing unit with a doctor that is a psychiatrist approval." Plaintiff's Response (#66), pg. 5. Plaintiff offers no evidence which supports his contention that an inmate can only be placed in the SNU on a voluntary basis with a doctor's approval. To the contrary, the evidence before this Court demonstrates that those inmates who have demonstrated a long-standing history of behavioral problems can be recommended for placement by MDOC staff, and reassigned to the SNU upon evaluation and approval of SNU staff. There is no evidence before this Court which demonstrates that an inmate has a choice regarding placement in the SNU.

retaliatory transfer claim fails); Pool, et. al. v. Ashcroft, et. al., 980 F.2d. 735 (8th Cir. 1992)(unpublished decision)(claims of retaliatory transfer to Special Management Facility and from prison honor dorm dismissed for lack of retaliatory motive).

Although a similar prohibition exists for disciplining an inmate for retaliatory reasons, the standard is different. To avoid liability on a retaliatory discipline claim, defendants must simply prove that there was "some evidence" supporting the decision to discipline the plaintiff. Goff v. Burton, 91 F.3d. at 1191. However, if the alleged retaliatory disciplinary action taken was in fact imposed for an actual violation of prisoner rules or regulations, an inmate's retaliatory discipline claim must fail. Cowans v. Warren, 150 F.3d. 910, 912 (8th Cir. 1998); Goff v. Burton, 91 F.3d. at 1191; Goff v. Burton, 7 F.3d. at 738; Orebaugh v. Caspari, 910 F.2d. 526, 528 (8th Cir. 1990); Rustan, Jr. v. Rasmussen, 208 F.3d. 218 (8th Cir. 2000)(unpublished decision). In the instant case, it is undisputed that plaintiff was written up in February 1998 for fighting. Not only do the prison records show this, but plaintiff admits to the fighting incident in his pleadings before this Court and in the letters he wrote during his assignment to SNU. *See,* plaintiff's response (#66); defendant's Exhibit J - plaintiff's letter of February 26, 1998. It is also undisputed that plaintiff has a long-standing history of engaging in physically aggressive or violent conduct while in the general prison population or administrative segregation units. Since there is "some evidence" (i.e. prison records and plaintiff's admission) that plaintiff did actually violate prison rules against fighting, and nothing to rebut the SNU's evaluation that plaintiff was in need of placement in the SNU for behavior management treatment, plaintiff's retaliatory discipline claim must fail.

As to plaintiff's claim that defendant either knew of or directed the "mistreatment" of plaintiff while housed in the SNU, no evidence has been presented to support this allegation. The evidentiary record before this Court demonstrates that defendant was not aware of or participated

-10-

in the decisions taken by SNU staff regarding plaintiff's assignment, the course of treatment proscribed by the SNU staff for plaintiff, the disciplining of plaintiff for violating institutional or MDOC rules while in the SNU, or plaintiff's numerous demands to be released from the SNU and transferred to another prison facility. Furthermore, plaintiff has failed to rebut the defendant's evidence that plaintiff had violated either MDOC or SNU rules on at least four (4) occasions. Plaintiff has failed to set forth any affirmative evidence that the acts of retaliation ("locked down" without sunlight, recreation, or fresh air) were taken outside the customary and acceptable restrictions imposed on the different status levels in SNU or as discipline for plaintiff's rules violations. Plaintiff has failed to set forth any affirmative evidence that in direct response to his letter-writing campaign, despite his requests, he was denied access to the prison grievance system and consideration for community placement. Plaintiff has failed to set forth affirmative evidence that he was "forced to undergo involuntary medical treatment". Finally, plaintiff has failed to set forth any affirmative evidence that defendant kept him in SNU for the purpose of sabotaging his parole consideration. There is simply no evidence that defendant Schriro instructed or in some way influenced the SNU staff to do anything to harm plaintiff or infringe his rights.

Plaintiff has failed to set forth even a scintilla of evidence which would allow any reasonable juror to find that defendant had knowledge of, participated in, acquiesced in, or directed the placement, treatment, and/or discipline of plaintiff in the SNU. Plaintiff's arguments before the Court appear to be more akin to a *respondeat superior* theory of liability; i.e because of the defendant's position she must have been involved in his SNU placement and treatment, and/or personally knew of his situation and chose to ignore it. The doctrine of *respondeat superior* is inapplicable in §1983 actions. <u>Givens v. Jones</u>, 900 F.2d. 1229, 1233 (8th Cir. 1990);

Wilson v. City of Little Rock, 801 F.2d. 316, 322 (8th Cir. 1986); Martin v. Sargent, 780 F.2d. 1334. 1338 (8th Cir. 1985).

In light of the afore-going determinations, the Court finds no need to address the remaining grounds for summary judgment as presented in the instant motion. The Court finds that no disputed material issue of fact exists as to the defendant's non-involvement and lack of knowledge regarding plaintiff's placement and treatment in the SNU. There is simply no affirmative evidence before this Court which even gives rise to an inference that defendant Schriro engaged in retaliatory conduct for plaintiff's exercise of any constitutional right or activity. Defendant Schriro is entitled to judgment as a matter of law.

Dated this 25th day of October, 2001.

_____
SENIOR UNITED STATES DISTRICT JUDGE

UNITED STATES DISTRICT COURT -- EASTERN MISSOURI
INTERNAL RECORD KEEPING

AN ORDER, JUDGMENT OR ENDORSEMENT WAS SCANNED, FAXED AND/OR MAILED TO THE FOLLOWING INDIVIDUALS ON 10/25/01 by aluisett
4:99cv1325    Bailey vs Schriro

42:1983 Prisoner Civil Rights

IF THIS IS A FINAL JUDGMENT YOU MUST SEND THE APPEAL PROCESS LETTER AND AN APPEAL PACKET TO PLAINTIFF.

Bernard Bailey -
041070
Potosi Correctional Ctr.
PCC
P.O. Box 2222, R.R. 2
Mineral Point, MO  63660

John Lynch -  3720              Fax: 314-340-7891

SCANNED & FAXED BY:

OCT 2 5 2001

MJM